CHAIM SCHNEEBALG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schneebalg v. Commissioner
Docket No. 25877-85.
United States Tax Court
T.C. Memo 1988-563; 1988 Tax Ct. Memo LEXIS 592; 56 T.C.M. (CCH) 833; T.C.M. (RIA) 88563; December 13, 1988. Steven Kamerman and Jerome Kamerman, for the petitioner. Rose E. Gole and Vallerie Volesko, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
Sec.6654(a)
1975
$  48,193.00
$  24,097.00
$ 2,076.34
1976
247,249.00
123,625.00
7,889.69
In his answer, respondent asserted as an alternative to the section 6653(b) addition to tax that petitioner was liable for *594 additions to tax under sections 6651(a)(1) and 6653(a). We must determine whether petitioner failed to report income for the years 1975 and 1976 and what additions to tax, if any, are warranted. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner was a resident of Jerusalem, Israel, at the time his petition was filed. Petitioner did not file Federal income tax returns for the taxable years 1975 and 1976 and did not pay any taxes for these years. Petitioner's wife filed a Federal income tax return for the year 1975. Petitioner retained the assistance of a tax preparer to prepare his wife's return. Petitioner's wife claimed "unmarried head of household" status and reported taxable income of $ 2,100.00 on this return. The return was not signed by petitioner. Petitioner, the son of a Jewish rabbi, was born in Poland in 1940. He never received any formal secular education, although he extensively studied Jewish religious subjects. Petitioner, his wife, and their three children moved to New York in 1974 or 1975 and remained there until 1979. After coming to New York, petitioner *595 opened a business selling antique Hebrew books and manuscripts that he had inherited from his father and carried to the United States. He made additional purchases of historic Hebrew books during the taxable years at issue. He was also engaged in the business of cashing checks for members of his religious community during those years. Petitioner made the following deposits into his bank accounts during the years in issue: Year(s)
Total Deposits
Bank
Account Number
1975 and
$  86,269.00
Chemical
XXXXX1284
1976
192,263.78
Bank
1976
220,350.63
Citibank
XXXX5409
1976
3,575.00
Citibank
XXXX9155
1976
59,226.25
European
XXXXX6785
American
The following loan proceeds were received in 1975 and 1976 and were part of the total deposits into the following accounts: Year
Amount
Bank
Account Number
1975
$  4,236.00
Chemical
XXXXX1284
1976
4,000.00
Bank
XXXXX1284
1976
17,120.00
Citibank
XXXX5409
1976
24,406.25
European
XXXXX6785
American
Also, in 1976 petitioner transferred $ 15,000 from one of his accounts into his Citibank account number XXXX9409. At trial, as well as at the administrative level, *596 petitioner failed to produce any books and records of his book sale business and check-cashing operations. The parties have, however, stipulated numerous checks, including: (1) checks drawn on petitioner's checking accounts in favor of various payees and "cash," (2) checks executed by third-party makers in favor of third-party payees and endorsed to petitioner and deposited into his accounts, (3) third-party checks payable to "cash" or petitioner and endorsed by him and deposited into his checking accounts, and (4) traveler's checks deposited into petitioner's accounts. OPINION We must first determine whether petitioner had unreported income arising from the sale of antique books and from his check-cashing business. As petitioner failed to keep books and records, respondent is entitled to reconstruct income in a method that clearly reflects income. Sec. 446(b). Respondent determined that petitioner had gross income of $ 142,483.00 in 1975 and $ 469,599.41 in 1976 using the bank deposits and specific item methods of income reconstruction. Petitioner does not challenge the propriety of respondent's use of these methods. Utilizing the specific item method, respondent determined *597 that petitioner had undeposited income from the sale of books in the amounts of $ 60,450.00 in 1975 and $ 54,710.00 in 1976. After allowing deductions for the above deposits representing loan proceeds and bank transfers, business expenses relating to the purchase of books and rent, standard deduction, and personal exemption, respondent concluded that petitioner had net taxable income of $ 87,822.00 for 1975 and $ 372,342.00 for 1976. The use of the bank deposits method of computing income has long been sanctioned by the courts as a method of reconstructing income. Goe v. Commissioner,198 F.2d 851 (3d Cir. 1952), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). Although not conclusive, bank deposits are prima facie evidence of income. Tokarski v. Commissioner,87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner,64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Once respondent has determined that unexplained deposits and expenditures constitute income, petitioner has the burden of proving such determinations erroneous. Rule 142(a); Nicholas v. Commissioner,70 T.C. 1057, 1064 (1978). *598 Petitioner testified that the vast majority of the bank deposits into his bank accounts were loan proceeds from religious "free loan societies." He stated that these loans were made by members of his Jewish community to assist his failing business. Zalman Esptein Epstein (Epstein), the sole witness other than petitioner, explained that a free loan society is a Jewish community group that makes short-term, interest-free loans to assist the needy members of their community as a noble form of charity. Epstein testified that he obtained loans from the free loan societies and members of the community on behalf of petitioner. However, he could not recall the signing requirements necessary to obtain loan proceeds from the societies or members of the community, the requirements for disbursement of the proceeds to petitioner, the amounts of loan proceeds transferred to petitioner, or whether the proceeds were issued a to petitioner in cash or in the form of a check. He did not identify any of the alleged lenders. Petitioner asserts that the third-party payee checks endorsed in his favor, as well as the checks issued by third-party makers payable to him or "cash," constitute loan proceeds. *599 Checks drawn on petitioner's account and payable to third parties or "cash" are claimed to represent repayment of these loans. We find little correlation between the numerous checks purporting to represent loan proceeds and those which petitioner suggests represent loan proceeds and those which petitioner suggests represent loan repayments. In his brief, petitioner asserts that this relationship is established by the fact that three checks drawn on his account in 1975, totalling $ 11,500, were made payable to Wolf Toder and by the fact that petitioner deposited four checks issued by Toder into his account, totalling $ 7,000. However, two of the checks issued by Toder (totalling $ 5,000) were made payable to cash, a $ 1,000 check named no payee, and only one $ 1,000 check was made payable directly to petitioner. Moreover, the checks asserted to constitute loan repayments predate the checks alleged to represent loan proceeds and the purported repayments largely exceed the purported loans. Petitioner also asserts that the existence of a loan and repayment thereof is established through a check drawn on J. Buxbaum's account and made payable to petitioner, dated January 9, 1976, in *600 the amount of $ 1,000 and a check drawn on petitioner's account, dated January 12, 1976, made payable to Buxbaum. Petitioner's check, however, is in the amount of $ 2,000. Neither Toder nor Buxbaum testified to corroborate the assertion that their checks represented loans to petitioner. We also note that a $ 1,000 check was issued by Epstein in favor of petitioner, but Epstein offered no testimony to support the conclusion that this constituted a loan. Given these discrepancies and the total absence of any corroborative evidence, we reject petitioner's claim that these assertions support his claim that any of the unidentified deposits constitute loans. There is no documentary evidence to establish the existence of the claimed loans. The only evidence of such loans is the vague and general (and in some respects contradictory) self-serving testimony of petitioner and of his long-time, personal friend, Epstein. Under all the circumstances, we are not required to accept this testimony as gospel. Fleischer v. Commissioner,403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Tokarski v. Commissioner,87 T.C. at 77. We, therefore, *601 hold that the disputed bank deposits are not loan proceeds. We think that one aspect of the claimed unidentified bank deposits requires further analysis. We recognize that petitioner did not point to any evidence to establish which checks deposited into his accounts represented deposits from his check-cashing business and which withdrawals from petitioner's account were attributable to cash disbursements relating to this business. However, it appears that many of the deposits were third-party payee checks endorsed to petitioner and deposited into his Chemical Bank checking account. The deposits that can be traced to and verified through deposit slips introduced into evidence totalled $ 12,112.23 in 1975 and $ 47,802.42 in 1976. We note that petitioner made substantial cash withdrawals from this account in the amounts of $ 13,400 in 1975 and $ 71,550 in 1976 through checks payable to "cash." The following chart reflects the third-party payee checks deposited into petitioner's Chemical Bank account and cash withdrawals from this account during the years in issue: Third-party Payee
Date
Cash Withdrawals
Checks Deposited
1975
11-12
--  $ 4,200.00
11-13
$ 350.00
--   11-13
400.00
--   11-14
1,000.00
--   11-17
--  798.28
11-18
2,000.00
--   11-19
3,000.00
--   11-20
1,000.00
--   11-24
--  613.95
11-24
--  1,000.00
12-15
--  500.00
12-15
--  5,000.00
12-23
4,900.00
--   12-29
750.00
--   Total
$ 13,400.00
$ 12,112.23 *602 Third-party Payee
Date
Cash Withdrawals
Checks Deposited
1976
1-2
2,200.00
3,000.00
1-5
2,100.00
--
1-6
2,500.00
--
1-8
500.00
--
1-9
200.00
--
1-9
2,000.00
--
1-13
--
2,000.00
1-14
9.000.00
5,000.00
1-16
1,500.00
4,975.00
1-19
4,900.00
--
1-20
300.00
--
1-21
950.00
--
1-22
--
1,000.00
1-29
2,500.00
--
2-13
--
3,000.00
2-19
1,800.00
--
2-20
4,800.00
--
2-23
3,500.00
--
2-25
2,500.00
--
3-1
700.00
8,000.00
3-1
--
3,000.00
3-3
--
2,000.00
3-4
2,500.00
--
3-5
2,000.00
5,000.00
3-8
4,500.00
--
3-9
2,000.00
--
3-10
4,500.00
--
3-12
--
593.52
3-15
4,600.00
--
3-18
3,200.00
--
3-22
--
3,000.00
3-22
--
5,608.90
3-24
1,300.00
--
3-26
500.00
500.00
3-29
2,500.00
--
3-31
500.00
--
4-7
--
1,125.00
4-8
1,500.00
--
Total
$ 71,500.00
$ 47,802.42
We find the above transactions to be consistent with the existence of a check-cashing business. Thus, it is reasonable to conclude that the third-party payee *603 checks deposited into petitioner's Chemical Bank do not constitute income from his business of book sales but more accurately reflect a "cash wash" from his check-cashing business. We are influenced in taking this path by the fact that the amounts of otherwise unidentified deposits are so large as to cause us to doubt that they could all be attributable to petitioner's book business. The record does not contain petitioner's checks from his other accounts; therefore, we cannot determine whether third-party checks deposited into these accounts are attributable to the check-cashing business. We think it appropriate to note at this point that the fact that we may not have been able fully to reflect petitioner's check-cashing activities in our calculations is of petitioner's own making and he must bear the consequences. Cohan v. Commissioner,39 F.2d 540, 544 (2d Cir. 1930); Lorente v. Commissioner,74 T.C. 260, 268 (1980), affd. on this issue 649 F.2d 152 (2d Cir. 1981). One further matter in connection with our conclusion as to petitioner's check-cashing activities requires attention. Under the statutes of New York, a licensed check *604 casher may charge or collect fees as follows:
(a) one-half of one per centum thereof and a handling fee of five cents per item, if the face amount of the item is less than fifty dollars or (b) one-half of one per centum thereof and a handling fee of ten cents per item if the face amount of the item is fifty dollars or more or (c) twenty-five cents, whichever is greater, except that such licensee may charge (a) one per centum of such check, draft or money order and a handling fee of five cents per item if the face amount of the item is less than fifty dollars or (b) one per centum thereof and a handling fee of ten cents per item if the face amount of the item is fifty dollars or more or (c) twenty-five cents, which is greater, for cashing checks, drafts or money orders where the place of payment is located outside the state of New York. * * * [N.Y. Banking Law sec. 372 (McKinney 1970).] Drawing from the above statutory provision and recognizing that we have no evidence that petitioner was a licensed check casher or that he did not charge in excess of the statutory fees, we find that petitioner had income from commissions of 3 percent of the face amount of *605 the third-party payee checks endorsed to petitioner and endorsed into his Chemical Bank account, equalling $ 363.37 for 1975 and $ 1,434.07 for 1976. By way of summary, we hold that petitioner had income in the amounts determined by respondent, reduced by $ 12,112.23 in 1975 and $ 47,802.42 in 1976 representing third-party payee checks cashed in his check-cashing business. To this reduced amount should be added income from check-cashing commissions in 1975 and 1976 in the amounts of $ 363.37 and $ 1,344,07, respectively. Respondent has also determined that petitioner is subject to the self-employment tax imposed by section 1402. Petitioner, who has the burden of proof, Rule 142(a), has not argued that any of the amounts which the Court finds were not loans or otherwise excludable from gross income do not constitute income attributable to a trade or business and therefore not subject to the self-employment tax. We hold for respondent on this issue. Sec. 1.1402(a)-1, Income Tax Regs. The tax will be calculated on the basis of the reduced amounts of gross income found herein. We turn now to the issue involving the additions to tax for fraud under section 6653(b). That issue *606 is one of fact and the burden is on respondent to establish, by clear and convincing evidence, actual and intentional wrongdoing on the part of petitioner encompassing acts designed to evade a tax believed to be due and owing; although fraud may never be imputed or presumed, it can be found to exist on the basis of an evaluation of the entire record. Estate of Spruill v. Commissioner,88 T.C. 1197, 1231-1242 (1987). Respondent may not satisy his burden of proof as to fraud on the basis of petitioner's failure to carry his burden in respect of the underlying deficiency. Otsuki v. Commissioner,53 T.C. 96, 106 (1969). A pattern of failing to file income tax returns is circumstantial evidence of fraud. Castillo v. Commisisoner, 84 T.C. at 409. However, such evidence standing alone is not sufficient. Kotmair v. Commissioner,86 T.C. 1253, 1260 (1986). It is well established that failure to keep records of all income is material, although not determinative, evidence of fraud. Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court. In this connection, *607 we note that petitioner withheld from respondent what few records he had. Furthermore, petitioner testified that he destroyed many of his records after the transactions were completed. Such action is indicative of fraud. United States v. Garavaglia,566 F.2d 1056, 1059 (6th Cir. 1977). A further indicium of fraud stems from petitioner's admitted extensive dealings in cash. Spies v. United States,317 U.S. 492 (1943); Baumgardner v. Commissioner,251 F.2d 311 (9th Cir. 1957), affg. a Memorandum Opinion of this Court; Bowlin v. Commissioner,31 T.C. 188, 203 (1958), affd. per curiam 273 F.2d 610 (6th Cir. 1960). Petitioner has stipulated that he knew he was required to file Federal income tax returns and that he received undeposited proceeds from the sale of books of at least $ 60,450 in 1975 and $ 71,135 in 1976. At least with respect to 1975, the amount was in excess of offsets for purchases, rent, etc., so that it would appear that a tax was clearly due for that year. And, while the amount of such offsets exceeded the amount for 1976, such excess of approximately $ 20,000 was far less than the *608 unidentified deposits for that year even after reducing those deposits by the amount we have attributed to petitioner's check-cashing activities. The residual amounts of unidentified deposits could well have been produced by petitioner's book business, given the volume of his admitted sales and the fact that some of the sales individually brought as much as $ 5,000 to $ 10,000. Further evidence of petitioner's knowing efforts to avoid tax can be gleaned from his consulting a return preparer about his wife's return without making an effort to implement his known obligation to file a return. To this can be added petitioner's inconsistent statements as to his marital status during the taxable years at issue and his vague and uncorroborated testimony that the unidentified deposits constituted loans. The foregoing factors are clearly badges of fraud and are not overcome by the fact that petitioner was a foreigner and perhaps an inexperienced businessman unfamiliar with the Federal income tax laws. Finally, although it may be that there are additional amounts of unidentified deposits beyond those excluded by respondent and the Court which should not be included in gross income, *609 we are satisfied that at least a portion of such deposits would constitute taxable income for the years 1975 and 1976. Consequently, an underpayment of tax is established and respondent need only prove that "a part" of that underpayment is due to fraud. See sec. 7454(a); Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court; Otsuki v. Commissioner,53 T.C. at 105. We hold that respondent has carried his burden of proof that a part of the deficiency in petitioner's Federal income taxes for 1975 and 1976 is due to fraud. Respondent determined an addition to tax under section 6654 for failure to pay estimated taxes. This addition to tax is mandatory unless petitioner can place himself within one of the computational statutory exceptions. This section has no provision relating to reasonable cause and lack of willful neglect. Grosshandler v. Commissioner,75 T.C. 1, 21 (1980); Estate of Ruben v. Commissioner,33 T.C. 1071, 1072 (1960). Petitioner has offered no proof to establish that he falls within any of the exceptions; therefore, this addition to tax based on *610 the recomputed deficiency is sustained. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩